# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**GAIL ANN LENZ**
   **Plaintiff,**

  **v.**          **Case No. 17-C-221**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
    **Defendant.**

## DECISION AND ORDER

Plaintiff Gail Lenz applied for social security disability benefits, alleging that she could no longer work due to severe allergies, particularly to cat dander, which restricted her ability to breathe during an attack, and reflex sympathetic dystrophy ("RSD") in her left knee, which limited ambulation and required her to use a cane. The Administrative Law Judge ("ALJ") assigned to the case concluded that plaintiff could, despite these severe impairments, still perform her past sedentary job as a billing clerk if offered the reasonable accommodations of moving her away from co-workers who owned cats and installing a HEPA filter in her work area.

As the Supreme Court has explained, the possibility of a workplace accommodation should not be taken into account in determining whether a person is disabled for social security purposes. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 803 (1999). The parties agree that the ALJ's decision is flawed and must be reversed, but they differ over the remedy. The Commissioner asks that the matter be remanded for further proceedings, as the record does not compel a disability finding. Plaintiff seeks remand for the sole purpose of calculating benefits; in the alternative, should the court find further proceedings warranted, she seeks

specific directives to guide the ALJ on remand.

## I. FACTS AND BACKGROUND

**A.    Plaintiff's Application and Supporting Materials**

Plaintiff applied for benefits in December 2012, alleging a disability onset date of April 7, 2011.  (Tr. at 149.)  She alleged that she could no longer work due to severe allergies, asthma, and a left knee injury.  (Tr. at 172.)  She reported past employment as a meter reader for the electric company in 2000 and a billing clerk for a healthcare provider from 2001 to 2011.  (Tr. at 173.)  She indicated that her knee problems limited her ability to walk, stand, squat, lift, and climb stairs, and that due to her hypersensitivity to cat dander she avoided being inside places for long periods of time.  (Tr. at 194.)  She reported using a cane when her knee hurt or felt like it was going to give out.  (Tr. at 195.)  She indicated that she cared for a dog (a toy poodle) and performed some household chores and gardening outside, but she avoided airplanes, movie theaters, or busy restaurants due to possible exposure to cat dander.  (Tr. at 214, 264.) Her husband submitted a report similarly indicating that while plaintiff could manage her self-care and perform chores around the house she could not be in public places for extended periods of time due to cat dander sensitivity and could not do activities requiring long spells on her feet.  She could no longer ski or bike due to her knee, but they did sometimes go camping.  (Tr. at 263-68.)

**B.    Medical/Vocational Evidence**

The medical records indicate that while plaintiff suffered from asthma and allergic rhinitis for many years, those conditions were stable until early 2011, when a new co-worker who owned cats arrived in the workplace, aggravating her symptoms, which continued even after

2

she moved to a location in the office a little farther away.  Her long-time treating allergist, Dr. Walter Brummund (Tr. at 808-16), excused her from work and made a referral to Dr. Jordan Fink, a sub-specialist in occupational asthma and allergies, who recommended that she be moved as far away from the co-worker as possible and that a HEPA air filter be placed in her area (Tr. at 283-91, 340, 393, 449, 482, 501).  The employer was apparently unable to move her any farther away and did not provide the HEPA filter, and plaintiff did not return to work. (Tr. at 296-97, 328, 331, 335, 459, 462.)  She experienced improvement after leaving the office in April 2011, but even then she continued to struggle with what she believed to be exposure to cat dander in places like the grocery store and church (Tr. at 328, 333, 462); she also reported experiencing an episode when her husband brought home boxes from her workplace (Tr. at 580).  Dr. Fink did note that, so long as she avoided exposure, her condition was stable and well controlled on her medications.  (Tr. at 329.)

Dr. Fink prepared a number of letter-reports regarding plaintiff's condition and limitations.  On September 11, 2012, he opined that "her permanent restrictions would be no exposure to cat dander, dust, chemicals, or extremes of heat, cold, or humidity."  (Tr. at 580.) On January 28, 2013, he indicated that plaintiff continued to have asthma even though she left her specific work environment.  "Cat dander is ubiquitous, and she contacts it frequently."  (Tr. at 528.)  He concluded: "Ms. Lenz is limited in her function due to her respiratory disease.  She needs to avoid dander, and non-specific irritants such as perfumes, smoke, and injections." (Tr. at 529.)

On November 25, 2013, Dr. Fink wrote that plaintiff was exquisitely sensitive to cats and cat dander, and her cat dander sensitivity resulted in a severe respiratory reaction of asthma and/or vocal cord motion dysfunction.  He further noted that cats are ubiquitous in our

3

environment, and individuals who have contact with cats have dander on their clothes.  Cat dander is one of the most potent allergens, and it remains in the air for a considerable time.

He continued:

> Ms. Lenz has shown that she cannot work in an environment where other individuals who have cats also work.  I would strongly doubt that there is such an environment as a "clean (meaning no cat dander or other irritants) environment" to allow Ms. Lenz to work without distress.  She becomes clinically disabled with respiratory reactions which are difficult to control.  Such repetitive exposure has resulted in permanent disability and precludes Ms. Lenz from working as her respiratory disease persists even when she is out of the workplace.

(Tr. at 578.)  He concluded:

> As a result, Ms. Lenz could not work on a full time basis in any type of office setting.  She would have respiratory distress as a result of cat dander exposure (undoubtedly some other worker would have cats) and have to leave work as has already occurred in her recent work.
> . . .
> In my opinion, Ms. Lenz's severe allergic disease has resulted in permanent disability.

(Tr. at 581.)

> On March 5, 2014, Dr. Fink wrote:

> Ms. Lenz developed cat dander aggravated asthma at her workplace.  This asthma has persisted and continued even after she has left the offending environment.  That asthma is the result of pulmonary damage from that workplace environment and requires potent medication for control.

> Thus, in my opinion, the exposure that Ms. Lenz had to cat dander at her job induced a sensitization that has caused her to have the restrictions set forth in my prior report.

> Further, it is my opinion to a reasonable degree of medical probability that her work exposure was a material contributory causative factor in the development of permanent sensitization such that the restrictions contained in my letter of September 11, 2012, are required.

4

(Tr. at 598.)[1]

Plaintiff also presented a vocational assessment report prepared in connection with a workers' compensation claim she filed with her employer, which concluded:

> Dr. Fink (9/11/12) assigned permanent restrictions of no exposure to cat dander, dust, chemicals, or extremes of heat, cold, or humidity. It is noted that even with moving her work space away from the source of the cat dander, Ms. Lenz continued to have symptoms and ultimately had to leave her office position. As cat dander can be carried by any person who has a cat, or was exposed to a cat, it is nearly ubiquitous in the environment. There is no guarantee that Ms. Lenz could safely avoid cat dander, dust or chemicals in any work environment. As such, she would be relegated to performing at-home work. Gail would have difficulty even going in for an interview or to a workplace for training/meetings, which is customary for a work-at-home position. Given the restrictions of Dr. Fink, it is my professional opinion that Gail has sustained a total loss of earning capacity.

(Tr. at 592.)

The records regarding plaintiff's RSD indicate that she fell in January 2000 while working as a meter reader, injuring her left knee, suffering chronic knee pain thereafter. (Tr. at 539, 652-55.) Notes from her treating physical medicine physician, Dr. Robert Zoeller, document treatment with medications, injections, a TENS unit, and therapy, with exams showing an antalgic gait favoring the left. (Tr. at 436-43.) In the fall of 2013, she reported pain in the right knee as well, with x-rays revealing degenerative changes, treated with further injections to both knees. (Tr. at 623-30.) Dr. Zoeller opined that plaintiff could perform sedentary work: standing/walking two hours and sitting six hours in an eight hour day; lifting up to 10 pounds; and occasionally bending and climbing, but never squatting or crawling. (Tr. at 317.)

---

[1] Following Dr. Fink's retirement in 2014, plaintiff transferred care back to Dr. Brummund, who noted that after leaving the workplace her symptoms had been stable except for occasional periodic exposure to cat dander. He recommended that she continue with airborne allergen avoidance measures and use of various medications and inhalers. (Tr. at 740-44.)

The records also discuss a May 2014 motor vehicle accident, after which plaintiff experienced neck, back, and diffuse abdominal pain. An abdominal CT scan revealed an umbilical hernia, which was surgically repaired. She also received medications and physical therapy for the neck and back pain. (Tr. at 601-12, 645.) In 2015, Dr. Zoeller recommended aquatic therapy for treatment of myofascial neck, chest wall, and abdominal pain, as well as chronic knee pain, to maximize range of motion, strengthening, and endurance to activity. (Tr. at 663.) Subsequent notes indicate that plaintiff transitioned to a home exercise program but continued to report pain symptoms that disrupted her daily activities and requiring further injections. She also saw a psychotherapist for PTSD symptoms. (Tr. at 706-08, 847.)

## C. Agency Review

The agency arranged for a consultative physical examination with Dr. John Kelly, who noted no respiratory difficulty, a steady gait with no assistive devices, and the ability to get up and off the exam table without any difficulty. Plaintiff's left knee displayed limited range of motion secondary to pain, although the knee joint appeared stable and intact. Motor strength in the upper and lower extremities was 5/5. Dr. Kelly noted that plaintiff's asthma and allergies appeared to be under good control with medications and inhalers. He opined that she should be able to do minimal activities such as office or sit down work operating a computer. Her knee would limit her in doing work requiring standing for a length of time or walking up and down stairs. She would be able to lift up to five to ten pounds. (Tr. at 539-42.)

The agency denied the application on initial review based on the opinion of Linda Sklar, M.D., that plaintiff could perform light work with occasional climbing and postural movements, and avoiding all exposure to fumes, odors, dust, gases, poor ventilation, etc. (Tr. at 77-78, 98.) Plaintiff requested reconsideration (Tr. at 109), but the agency maintained the denial based on

6

the review of Syd Foster, D.O., who concluded that plaintiff could perform light work avoiding even moderate exposure to fumes, odors, dust, gases, poor ventilation, etc., and avoiding concentrated exposure to hazards such as machinery, heights, etc. (Tr. at 93-94, 103).

Plaintiff requested a hearing (Tr. at 110), and on August 6, 2015, she appeared with counsel before an ALJ (Tr. at 34). The ALJ also summoned a vocational expert ("VE"). (Tr. at 34.)

## D.    Hearing Testimony

### 1.    Plaintiff

Plaintiff testified that she was 51 years old, with a two year degree in a wildlife forestry conservation program. (Tr. at 40.) She reported that she injured her knee while working as a meter reader in 2000. (Tr. at 43-44.) She then worked as a billing clerk until 2011 when she left due to exposure to cat dander, later receiving a workers' compensation settlement from the employer. (Tr. at 41-42.) The billing clerk job was performed sitting down and required lifting nothing heavier than files; she spent most of her time on the computer or phone. (Tr. at 44-45.) Plaintiff testified that she became very ill while working this job due to exposure to cat dander, which activated her allergy, caused her to break out in hives, and made it hard to breathe. (Tr. at 45-46.) The employer tried moving her to different locations in the office, but that did not solve the problem. (Tr. at 52.) Her doctor recommended a HEPA filter, but the employer did not provide one. (Tr. at 45-46.)

Plaintiff testified that she had issues with substances other than cat dander, such as perfumes, which made it hard to breathe. (Tr. at 53.) She testified that, when she went out, she never knew whether she would be exposed. (Tr. at 46.) She indicated that she had

reactions a few times per week when she went out; a reaction could happen in as little as 20 minutes. (Tr. at 53-54.) During a reaction she got hives, shortness of breath, and severe facial edema. (Tr. at 54.) Her doctor prescribed prednisone, which she last used in December. She also had inhalers she could use in case of an attack, which helped, but if badly exposed she got very sick and could not breathe well. (Tr. at 46.) She did limited shopping and did not go to church anymore because got exposed to cat dander every time she tried to attend; she had the services recorded and watched them at home. She was able to go to family homes because they did not have cats or dogs. Plaintiff had a poodle but was not allergic to her. (Tr. at 47.)

Plaintiff testified that she spent her time reading, caring for her dog, and working on vocal cord dysfunction exercises; she also liked to be outside at her house gardening. She indicated that she was able to do light housework, and could dress, bathe, and use the bathroom independently. (Tr. at 50.) She no longer flew on airplanes; when they traveled, she and her husband used their RV. (Tr. at 48.)

Plaintiff further testified that she had a car accident in 2014, after which she had hernia surgery. She continued to have pain in her neck, abdomen, chest, head, and back. (Tr. at 51.) She took Tramadol and Valium for pain every day, with the medications causing nausea and fatigue. (Tr. at 60.) Prior to the accident, plaintiff used a cane for about an hour several times per week; since the accident, she used it every day, at least a few hours per day. (Tr. at 56-58.) She also laid down for about two hours per day due to pain and fatigue. (Tr. at 61.) She continued to experience knee pain and swelling, as well. (Tr. at 49.)

Plaintiff indicated that she could no longer perform her billing clerk job, even if not exposed to cat dander, due to pain, trouble concentrating, and lack of energy. (Tr. at 51, 61.)

8

Plaintiff's doctor recommended that she not go back to work in an office setting due to the risk of exposure; plaintiff had previously worked in a healthcare facility, and they could not guarantee the quality of the air. (Tr. at 56.)

### 2. Vocational Expert

The VE classified plaintiff's past meter reader job as light and semi-skilled, and the billing clerk job as sedentary and semi-skilled. (Tr. at 64.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, capable of light work, avoiding moderate exposure to irritants such as fumes, odors, dusts, and gasses, and avoiding exposure to unprotected heights. The VE testified that the meter reader job involved exposure to weather conditions and pollen, but the billing clerk job could be done. Reducing the exertional level to sedentary, the billing clerk job could still be done. If the person needed to use a cane to ambulate, that job could also still be done. (Tr. at 65.)

On questioning by counsel, the VE testified that there could be no guarantee than an office environment would be cat dander or dust free. (Tr. at 67-68.) HEPA filters are used in some workplaces (Tr. at 66), but they would not be a standard thing offered in an office environment (Tr. at 69). The ALJ interjected that he would not consider this response, as the VE was not an expert on the Americans With Disabilities Act ("ADA"), which required reasonable accommodations. (Tr. at 69-71.)

## E. ALJ's Decision

On September 18, 2015, the ALJ issued an unfavorable decision. The ALJ determined that plaintiff had not worked since April 7, 2011, the alleged onset date, and that she suffered from the severe impairments of asthma, allergic rhinitis, and RSD (Tr. at 20), none of which

qualified as conclusively disabling under the agency's Listings of impairments (Tr. at 21). The ALJ then found that plaintiff retained the residential functional capacity ("RFC") to perform sedentary work, except that she must avoid even moderate exposure to irritants, and must avoid concentrated exposure to unprotected heights. In making this finding, he considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 21.)

In her reports, plaintiff alleged disability due to severe allergies, asthma, and chronic pain in the left knee due to RSD. Exposure to cat dander, cold weather, and humidity exacerbated her breathing symptoms, and her knee problem limited her ability to squat, stand, walk, kneel, and climb stairs, and required her to use a cane at times. At the hearing, plaintiff testified that she experienced knee pain and swelling. She also suffered allergic reactions about once per week, which could happen simply going out in public. She also testified that she suffered from chronic fatigue and must lie down two hours per day due to pain and fatigue. (Tr. at 22.) The ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible for the reasons explained in this decision." (Tr. at 22.)

The ALJ then discussed the medical evidence, with records from 2012 showing that plaintiff's knee condition was managed with medication and a TENS unit. She was able to walk using a cane, with a slightly antalgic gait favoring the left side. In 2014 and 2015, she received injections due to an RSD flare-up. The ALJ concluded that while the RSD was limiting, it did not prevent work at the sedentary level. (Tr. at 22.)

The medical evidence also documented a long history of asthma and allergic rhinitis, effectively managed with a medication regimen. Her conditions worsened when a colleague

10

who had cats started working in the office, but a physical exam in April 2011 did not reveal plaintiff to be in respiratory distress and her breathing was un-labored. (Tr. at 22.) The records showed that her conditions remained stable through 2014 except for periodic exposure to cat dander. At an appointment in June 2015, plaintiff reported doing well since 2014 except for one episode of coughing, wheezing, and chest tightness on June 25, 2015. (Tr. at 23.)

At the consultative exam, Dr. Kelly noted that plaintiff's breathing was clear and non-labored, and that she walked with a steady gait, using no assistive devices. She had limited knee range of motion but no swelling or deformity, and full strength in the lower and upper extremities. (Tr. at 23.)

Following his review of the medical evidence, the ALJ stated that plaintiff's "allegations of disabling symptoms and limitations are not completely credible." (Tr. at 23.) Focusing on her exertional abilities, the ALJ noted that plaintiff's 2013 reports indicated that she could sit for six hours and stand/walk for two hours in a day, consistent with her performance at the consultative exam. While she experienced increased pain after the May 2014 auto accident, the ALJ found that she maintained the physical ability to tolerate the exertional demands of sedentary work with no concentrated exposure to unprotected heights. (Tr. at 23.)

As for plaintiff's breathing problems, the ALJ noted that plaintiff's pulmonary function tests were generally within normal limits, respiratory exams had generally been unremarkable, and her condition had remained relatively stable except for sporadic exposure to cat dander. Further, her doctors gave conservative recommendations for dealing with the issue at work, including use of a HEPA filter and avoiding people who own cats. Unfortunately, neither recommendation was ever implemented. Nor was there evidence that plaintiff requested reasonable accommodation under the ADA to implement these recommendations, which, the

ALJ believed, would have allowed plaintiff to perform her past relevant work within her RFC. (Tr. at 23.)

Plaintiff argued that she needed a work environment free of cat dander, but the ALJ found that virtually impossible in any environment involving exposure to ambient air. The ALJ cited a January 28, 2012, letter from Dr. Fink indicating that "cat dander is extremely prevalent in the environment," which the ALJ took to mean to include most routine non-work environments involving exposure to ambient air. (Tr. at 24, citing Tr. at 312.) The ALJ found that the proposed limitation to a dander-free work environment, on a matter not totally within an employer's control, "sets too high a bar." (Tr. at 24.) It also set a standard for employment that plaintiff did not insist upon in her private life, the ALJ concluded, as she owned a dog, suggesting an ability to tolerate some amount of pet dander, and had other opportunities to be exposed to pet dander as she went about her daily life, including activities such as helping her husband in the garden, camping in the family RV, and participating in pool therapy. The record thus suggested that plaintiff could tolerate a work environment that did not contain even moderate exposure to pulmonary irritants. (Tr. at 24.)

The ALJ then considered the medical opinion evidence. On initial review, state agency medical consultant Dr. Sklar opined that plaintiff could perform light work with no exposure to pulmonary irritants. On reconsideration, agency medical consultant Dr. Foster found similar limitations, with the addition of no concentrated exposure to hazards. Plaintiff's treating physician, Dr. Zoeller, and the consultative examiner, Dr. Kelly, found her limited to sedentary work, and the ALJ gave greater weight to their opinions. (Tr. at 24.)

The ALJ also considered the statements from plaintiff immunologist, Dr. Fink. On September 11, 2012, Dr. Fink recommended that plaintiff have no exposure to cat dander,

dust, chemicals, or extremes of heat, cold or humidity. On January 28, 2013, Dr. Fink wrote that plaintiff was unable to continue working in the office in 2011 with a co-worker who owned a cat. He opined that she needed to avoid dander, perfumes, and smoke. (Tr. at 24.) On November 25, 2013, Dr. Fink submitted another letter describing plaintiff's sensitivity to cat dander, describing the potency of cat dander, and opining that plaintiff would have to work in an environment completely free of cat dander or other irritants. (Tr. at 24-25.) Dr. Fink did not believe such an environment existed. (Tr. at 25.)

The ALJ gave partial weight to Dr. Fink's opinions. While the record supported his conclusion that plaintiff suffers from severe reactions to cat dander, the ALJ found his opinion that she could not have any exposure to pulmonary irritants "exaggerated," as plaintiff kept a dog in her home and helped in the garden, which suggested some ability to tolerate pulmonary irritants with proper use of medication. In fact, Dr. Fink noted that her asthma was controlled on medication, although at times she would have breakthroughs. (Tr. at 25.)

The ALJ then returned to the accommodation issue, noting Dr. Fink's April 2011 suggestions of moving plaintiff away from the co-worker with cats and getting a HEPA filter, which for unknown reasons were not implemented, causing plaintiff to leave the job with a workers' compensation settlement. The ALJ stated that, in his view, requiring an employer to guarantee an allergen-free environment would be unreasonable under the ADA or the Social Security Act. Here, Dr. Fink provided simple and reasonable accommodations meeting the objectives of both laws, which would have allowed her to perform her job.

> These recommendations were nothing more than what [plaintiff] was entitled to under the ADA. Neither recommendation would have turned [plaintiff's] work into less than competitive work. Instead, they would simply have provided [plaintiff] with what she was legally entitled to and allowed her to perform her job in an environment where she would have avoided even moderate exposure to irritants.

13

> [Plaintiff's] condition has remained stable generally throughout the period at issue. Therefore, only limited weight is given to Dr. Fink's opinions.

(Tr. at 25.)

The ALJ also discussed plaintiff's vocational assessment report, which concluded that plaintiff suffered from a total loss of earning capacity due to the limited work options available. The ALJ gave little weight to this assessment, as the consultant based the report on the assumption that plaintiff had zero tolerance for pulmonary irritants. The ALJ also found the report inconsistent with the 2011 recommendation for a HEPA filter, plaintiff's dog ownership, and her ability to function within a non-work environment where cat dander was prevalent. The ALJ further noted that the report was prepared to support plaintiff's workers' compensation claim, not for social security. The ALJ gave greater weight to the VE testimony at the hearing. (Tr. at 25.)

Finally, the ALJ considered the reports of plaintiff's husband, who indicated that plaintiff cares for the family dog and performs some household chores but no longer skies or bikes due to knee pain. The ALJ gave his statements some weight, as they were generally consistent with plaintiff's reports. (Tr. at 26.)

The ALJ concluded:

> In sum, the above residual functional capacity assessment is supported by the objective medical evidence contained in the record. Treatment notes in the record do not sustain [plaintiff's] allegations of disabling pain and asthma limitations. The consultative examination . . . supports the residual functional capacity as described above. [Plaintiff] does experience some levels of pain and limitations but only to the extent described in the residual functional capacity above.

(Tr. at 26.)

Based on this RFC, and relying on the VE's testimony, the ALJ found plaintiff capable

of performing her past relevant work as a billing clerk.  The ALJ accordingly found her not

disabled.  (Tr. at 26.)

The Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's

decision the final word from the agency on the application.  See Lanigan v. Berryhill, 865 F.3d

558, 563 (7th Cir. 2017).  This action followed.[2]

## II.  STANDARD OF REVIEW

The court reviews an ALJ's decision to determine whether it applies the correct legal

standards and is supported by substantial evidence.  Summers v. Berryhill, 864 F.3d 523, 526

(7th Cir. 2017).  Substantial evidence means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.  Id.  Although the court will not, under this

deferential standard, re-weigh the evidence or substitute its judgment for the ALJ's, this does

not mean that the court will simply rubber-stamp the decision without a critical review of the

---

[2]As is standard in social security appeals in this district, the court issued a briefing schedule, pursuant to which plaintiff filed her opening brief in support of reversal.  The Commissioner responded with a motion to remand for further proceedings.  Plaintiff then filed a reply brief opposing the motion and seeking remand for calculation of benefits.  As I indicated in Lentz v. Berryhill, No. 16-C-1450, slip op. at 3-4 (E.D. Wis. Nov. 1, 2017), a decision issued after the briefing in this case, the following procedure should be used in this situation.  If, after the plaintiff files her brief on the merits, the Commissioner concludes that remand is warranted, but the parties are unable to agree on a stipulated remand order, the Commissioner should file, not a motion for remand, but a brief responding to the plaintiff's brief.  If the dispute is over remedy, the Commissioner should, in that brief, acknowledge the errors she concedes, then discuss why a judicial award is inappropriate under Seventh Circuit standards.  If the Commissioner agrees that the ALJ committed some of the errors alleged by the plaintiff but not others, she should include in her brief the directives she recommends for the ALJ on remand, consistent with the errors she concedes.  The plaintiff will then have the chance to file a reply brief advocating for her preferred remedy and/or setting forth any additional directives she believes are appropriate.  Although the Commissioner did not follow this procedure in the present case, her memorandum in support of the motion to remand is sufficient for me to evaluate her position on the issue of remedy, and plaintiff was able to reply to that memorandum.

record.  Minnick v. Colvin, 775 F.3d 929, 935 (7ᵗʰ Cir. 2015).  A decision that lacks evidentiary support or an adequate discussion of the issues will be remanded.  See, e.g., Villano v. Astrue, 556 F.3d 558, 562 (7ᵗʰ Cir. 2009).  Further, because the court need not defer to conclusions of law, if the ALJ commits legal error the court may reverse without regard to the volume of evidence in support of the factual findings.  White v. Apfel, 167 F.3d 369, 373 (7ᵗʰ Cir. 1999).

Should it find grounds to reverse, the court may remand the case for further proceedings or instruct the Commissioner to calculate and award benefits.  See Israel v. Colvin, 840 F.3d 432, 436 (7ᵗʰ Cir. 2016).  However, the latter remedy is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion – that the applicant qualifies for disability benefits."  Allord v. Astrue, 631 F.3d 411, 415 (7ᵗʰ Cir. 2011); see also Briscoe v. Barnhart, 425 F.3d 345, 355 (7ᵗʰ Cir. 2005) ("When an ALJ's decision is not supported by substantial evidence, we have held that a remand for further proceedings is the appropriate remedy unless the evidence before the court compels an award of benefits.  An award of benefits is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion.") (internal citations and quote marks omitted); Uphill v. Barnhart, 271 F. Supp. 2d 1086, 1092-93 (E.D. Wis. 2003) (explaining that remand for further proceedings will generally be the remedy, given the limited nature of judicial review and the authority afforded the ALJ to weigh the evidence, resolve conflicts, and make independent findings of fact).

### III.  DISCUSSION

### A.    Reasonable Accommodation

The ALJ believed that plaintiff could have continued in her billing clerk job, avoiding even

moderate exposure to irritants, if the employer had provided the accommodations Dr. Fink initially recommended: moving her away from the cat-owning co-worker and getting a HEPA filter.  On the other hand, he found that requiring an employer to provide a completely allergen-free work environment, as Dr. Fink later indicated was necessary, would be unreasonable.  (Tr. at 25.)

The ALJ erred by injecting this reasonable accommodation analysis into his disability determination.  As the Supreme Court has noted, "when the SSA determines whether an individual is disabled for SSDI purposes, it does <u>not</u> take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI." <u>Cleveland</u>, 526 U.S. at 803; <u>see also</u> <u>Morsea v. Berryhill</u>, No. 15-17218, 2018 U.S. App. LEXIS 3281, at *6 (9th Cir. Feb. 12, 2018) (remanding where the VE testified that an employer would not tolerate the claimant's need for an oxygen tank unless granted an accommodation); <u>Blackette v. Colvin</u>, 52 F. Supp. 3d 101, 117-18 (D. Mass. 2014) (reading <u>Cleveland</u> "to mean that the agency cannot consider the possibility that a claimant will receive an accommodation in determining whether they would be able [to] hold a job (i.e., the hearing officer could not say 'this claimant would be disabled unless she received a reasonable accommodation, but I will assume she will receive such an accommodation')"); <u>Sullivan v. Halter</u>, 135 F. Supp. 2d 985, 987-88 (S.D. Iowa 2001) ("Whether or how an employer might be willing, or required, to alter job duties to suit the limitations of a specific individual is not relevant because Social Security's assessment must be based on broad vocational patterns . . . rather than on any individual employer's practices.") (internal quote marks omitted).

Even if it could be appropriate to consider an accommodation in some cases, the record

here shows that plaintiff's previous employer did not provide the recommended HEPA filter (Tr. at 45), and the VE testified that such filters are not generally provided in an office environment (Tr. at 69). Nor does the record contain evidence as to the cost or feasability of installing a sufficiently potent HEPA filter.[3] As to Dr. Fink's other recommended accommodation, the record shows that the employer did move plaintiff some distance away from the cat-owning co-worker, but her allergies persisted, and the record contains no evidence that someone could maintain competitive employment as a billing clerk if they needed to be isolated in some distant section of the office.

The ALJ's statement that "requiring an employer to guarantee an allergen-free environment is unreasonable under [the ADA and Social Security Act]" (Tr. at 25) further demonstrates the problem of conflating these two laws. The ALJ should include in the RFC all limitations supported by the evidence, not just those which could be reasonably accommodated under the ADA. A contrary rule would, as plaintiff notes, punish social security claimants for having medical conditions that present too great an obstacle to work. In other words, the fact that a particular limitation may be work preclusive (and/or could not be accommodated) provides no basis for rejecting it.

### B.    Dr. Fink's Opinions

The ALJ also erred in his evaluation of Dr. Fink's opinions. Social security regulations provide that, generally, more weight is given to the opinions of treating sources, as they are most able to provide a detailed, longitudinal picture of the claimant's impairments. 20 C.F.R.

---

[3]It is also worth noting that Dr. Fink offered no assurance that plaintiff would be able to work with a HEPA filter. Rather, he recommended the filter, movement away from the cat owner, immunotherapy, and medication in the "hope that this might be able to reduce her symptoms." (Tr. at 449.)

§ 404.1527(c). If a treating source's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the ALJ must give it controlling weight. Id. If the opinion does not meet the test for controlling weight, the ALJ must decide how much weight it does deserve, considering the length, nature, and extent of the treatment relationship; the support offered by the source for the opinion; the consistency of the opinion with the record as a whole; and the source's specialization. Id. The ALJ must always offer good reasons for discounting the opinion of a treating physician. Israel, 840 F.3d at 437.

The ALJ gave Dr. Fink's reports only partial weight, finding "exaggerated" his opinion that plaintiff could have no exposure to dander or other irritants, given her activities including caring for a dog, gardening, camping, and pool therapy. (Tr. at 25.) However, the ALJ failed to explain how any of these activities undercut Dr. Fink's opinion that plaintiff could no longer work in an office setting. Plaintiff testified that she was not allergic to her poodle (Tr. at 47), and Dr. Fink never suggested that plaintiff could not tolerate outdoor allergens such as pollen or the chlorine in a swimming pool. Nor did the ALJ explain why plaintiff's ability to function in the controlled environment of her home and the family RV meant that she could also function in a workplace, where, the record suggests, cat dander is difficult to avoid.[4] (See Tr. at 67, 578, 592.) Indeed, plaintiff testified that when she attempted public, indoor activities such as church or shopping she experienced exacerbations. (Tr. at 47, 53-54.)

---

[4]As indicated above, in one of his letters, Dr. Fink noted that "cat dander is extremely prevalent in the environment" (Tr. at 312), which the ALJ took "to mean to include most routine non-work environments involving exposure to ambient air." (Tr. at 24.) The ALJ relied on this assumption in finding that plaintiff's claimed need for a dander-free workplace conflicted with the manner in which she conducted her private life. However, I do not read Dr. Fink's letter as saying cat dander is present everywhere, including plaintiff's home, front yard, and RV.

In any event, even if plaintiff's activities suggested that her allergies were not totally incapacitating, the issue is whether she can sustain competitive employment.  See Kouril v. Bowen, 912 F.2d 971, 975-76 (8th Cir. 1990) (reversing where the ALJ improperly concluded that because the claimant could engage in limited activities in controlled environments, despite her allergies, that she could tolerate full-time employment in environments where she had worked before).  As the Seventh Circuit has repeatedly noted, "a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."  Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013).[5]

## C.    Remedy

Plaintiff presents a strong case for benefits.  The medical evidence demonstrates that she suffers from a severe cat dander allergy; Dr. Fink, a specialist in occupational allergies, concluded that she cannot, despite treatment, sustain any exposure to cat dander; and, as indicated by the vocational experts, there can be no assurance that a sedentary work environment will be free of this allergen.

Nevertheless, I cannot conclude that the record compels an award of benefits, as there is some evidence that could be seen as undermining plaintiff's claim, which the ALJ must evaluate under the correct legal standards.  See Israel, 840 F.3d at 441.  While Drs. Fink and Sklar opined that plaintiff needed to avoid all exposure to irritants, Dr. Foster opined that she

---

[5]The ALJ also relied on treatment records indicating that plaintiff's asthma was stable and controlled on medication, despite occasional breakthroughs.  (Tr. at 25; see, e.g., Tr. at 312, 329, 740-41, 742-44.)  However, the ALJ failed to explain how plaintiff's ability to function after leaving the workforce and implementing airborne allergen avoidance measures supported the rejection of Dr. Fink's opinion that plaintiff could not work full-time in an office.

should avoid moderate exposure (Tr. at 94), and the VE testified that a person with such a limitation could perform plaintiff's past work (Tr. at 65). The VE further explained that office jobs generally involve "a clean type environment," with minimal environmental conditions (Tr. at 68), although he could not guarantee it would be cat dander free (Tr. at 67).

While the opinion of a non-examining consultant does not, alone, suffice to reject a treating source report, e.g., id. at 437, the record also contains the examination findings of Dr. Kelly, who noted no respiratory difficulty, respirations 20 per minute and not labored, and no rhonchi or wheezing (Tr. at 540). He found that plaintiff's asthma and allergies appeared to be under good control with medications and inhalers; plaintiff described severe asthma, but she had never been hospitalized for it. Dr. Kelly opined that if she continued on her medications her allergies and asthma should stay under good control, and she should be able to do office work. (Tr. at 541.) The record also shows that plaintiff was able to work in an office for about 10 years, despite her allergies/asthma, before the cat owning co-worker arrived.[6] And, as the ALJ indicated, the treatment notes generally documented normal respiratory examinations. (Tr. at 23.)

That plaintiff generally functioned well during medical examinations (and in the controlled environment of her home) does not necessarily mean that she could work in an office. But the extent to which she experienced exacerbations in such public places depends,

---

[6]As the Commissioner notes, Dr. Fink initially recommended that plaintiff be moved away from the co-worker and use a HEPA filter. While I do not see this as necessarily inconsistent with his later conclusion that she could not work in an office, see note 3, supra, resolving possible conflicts in the evidence is the ALJ's job.

at least in part, on the credibility of her statements, which the ALJ failed to fully evaluate.[7]  See Johnstone v. Astrue, 843 F. Supp. 2d 962, 980 (E.D. Wis. 2012) (noting that issues of credibility and weight are most adequately addressed by the ALJ).  While the ALJ appeared to doubt the credibility of plaintiff's claims of disabling pain and fatigue, he did not specifically determine the frequency of her exacerbations outside the home.

Plaintiff is understandably impatient with the delay in resolving her case.  However, this is the first remand, and for the reasons stated the matter should be returned to the ALJ for consideration of the evidence under the correct standards.  See, e.g., Hunt v. Astrue, 889 F. Supp. 2d 1129, 1149 (E.D. Wis. 2012) (remanding for reconsideration of treating source report and claimant credibility).

On remand, the ALJ must determine disability without regard to any reasonable accommodations plaintiff could receive under the ADA.  He must reevaluate the opinions of Drs. Fink and Foster under the factors set forth in 20 C.F.R. § 404.1527(c), and the credibility of plaintiff's statements under SSR 16-3p, paying specific attention to plaintiff's maximum possible exposure to dander and other irritants.  Finally, he must reassess, using reliable vocational evidence, whether work exists for plaintiff given the extent to which she can be exposed to such irritants.[8]

---

[7]Plaintiff notes in reply that Dr. Fink based his opinions not only on her statements but also on objective testing, which demonstrated her severe allergy to cat dander.  Everyone agrees that the allergy is severe.  The key issue is whether plaintiff will experience disabling exposure in a workplace.  In concluding that she would, Dr. Fink appeared to rely in part on plaintiff's statements regarding the frequency and severity of her perceived exposure to cat dander in public places.  (See Tr. at 328-29.)

[8]Plaintiff worries that the ALJ will, on remand, revisit favorable findings, such as the limitation to sedentary work.  Neither side has contested that finding, which seems well-supported by the record.  The Commissioner agrees that the focus on remand should be on

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision.  The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 9th day of March, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

plaintiff's cat dander allergy.